**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **KAMMRIN BERNARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:21-cv-00384-SLC** |
| | ) | |
| **SWEETWATER SOUND, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Kammrin Bernard filed this action against her former employer, Sweetwater Sound, Inc. ("Sweetwater"), on September 23, 2021, asserting that it discriminated against her on the basis of her sex and pregnancy, and then retaliated against her after she requested accommodations due to her pregnancy status, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq*., as amended by the Pregnancy Discrimination Act (PDA). (ECF 5).[1] On September 28, 2022, Sweetwater filed a motion for summary judgment (ECF 13), a memorandum in support (ECF 14), a statement of material facts (ECF 15), and supporting evidence (ECF 15-1 to ECF 15-3). Bernard then filed a brief in opposition (ECF 26), a response to Sweetwater's statement of material facts (ECF 42), and supporting evidence, including her own affidavit (ECF 22-1 to ECF 22-5).[2] Sweetwater timely filed a reply brief (ECF 32) and a reply to Bernard's statement of material facts (ECF 43).

When filing its reply brief on January 11, 2023, Sweetwater also filed a motion to strike

---

[1] Subject matter jurisdiction under 28 U.S.C. § 1331 is proper in this Court. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (ECF 9).

[2] Bernard was granted leave to file a separate statement of material facts that complied with this Court's Local Rule 56-1(b) after she filed her response brief. (*See* ECF 36, 39, 42); N.D. Ind. L.R. 56-1(b).

portions of Bernard's affidavit (ECF 33), attaching excerpts of her deposition and discovery responses in support (ECF 33-1, 33-2). Bernard filed a response brief (ECF 37) to the motion to strike on January 24, 2023, and Sweetwater timely filed a reply brief (ECF 38). Therefore, the motion for summary judgment and motion to strike are ripe for ruling. Because Bernard's opposition to the motion for summary judgment relies upon evidence subject to Sweetwater's motion to strike, the Court will begin with the motion to strike.

For the following reasons, Sweetwater's motion to strike will be GRANTED IN PART and DENIED IN PART, and its motion for summary judgment will be DENIED.

## I. MOTION TO STRIKE

### A. Applicable Law

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos*., No. 2:04-cv-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id*. (citations omitted). For example, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see DeLoach v. Infinity Broad*., 164 F.3d

2

398, 402 (7th Cir. 1999); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir.

1985); (3) inferences or opinions not "grounded in observation or other first-hand experience,"

*Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); (4) mere speculation or

conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (5) statements or

conclusions that "contradict prior deposition or other sworn testimony," without explaining the

contradiction or attempting to resolve the disparity, *Buckner v. Sam's Club, Inc.*, 75 F.3d 290,

292 (7th Cir. 1996) (collecting cases); *see James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020)

("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the

party's prior deposition or other sworn testimony." (citation omitted)).

### B. Discussion

Sweetwater seeks to strike the following portions of Bernard's affidavit (ECF 22-1) filed

in response to its summary judgment motion:

1. A Portion of Paragraph 4. Sweetwater seeks to strike paragraph 4 of Bernard's

affidavit to the extent it states her job as a Conveyable Packer in Sweetwater's Distribution

Center had a "light section" and a "heavy section." (ECF 33 at 2; *see* ECF 15-1 ¶ 5). Sweetwater

claims that despite Bernard spending much of her deposition talking about her job, at no time did

she testify that her job had a "light section" and a "heavy section." (ECF 33 at 2 (citing ECF 33-

1)). Rather, Sweetwater contends that Bernard testified multiple times about encountering heavy

"totes" on the job, and that totes could weigh up to 35 pounds. (*Id.* (citing ECF 33-1 at 2-4)).[3]

Consequently, Sweetwater claims that the portion of Bernard's affidavit referring to a "light

---

[3] The portions of Bernard's deposition cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the deposition transcript is open in ECF, rather than the page numbers printed within the deposition transcript.

section" and a "heavy section" should be stricken as inconsistent with her prior deposition testimony. (ECF 33 at 2).

But as Bernard points out, and correctly so, she was never directly asked during her deposition whether her job had a "light section" and a "heavy section." (ECF 37 at 2; *see* ECF 33-1 at 4). She did testify that the totes in her job range from "a few ounces to thirty-five (35) pounds," that totes are "usually pretty light" as "[f]ive pounds is the average," and that "they had the heavy stuff separated in a different section, and [she] never worked that section before." (ECF 33-1 at 4 ("That's where they had the big amps and heavier things, and that was the station over next to me. I never worked there.")). "[A]n affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (citation and internal quotation marks omitted)). "[A] contradiction . . . only exists when the statements are inherently inconsistent, not when the later statement merely clarifies an earlier statement which is ambiguous or confusing on a particular issue." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) (citations and internal quotation marks omitted). "[The] contradictions [must be] so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Castro*, 786 F.3d at 571 (citation omitted).

Here, the Court does not view Bernard's statement in her affidavit that her job had a "light section" and a "heavy section" as inherently inconsistent with her earlier deposition testimony. She was never asked that question during her deposition. Consequently, Sweetwater's motion to strike this portion of paragraph four will be DENIED.

4

    2. The Description of the Phone Call in Paragraph 5. Next, Sweetwater seeks to strike a description of a November 27, 2020, telephone call between Bernard and Cindy Goheen, a human resource (HR) employee at Sweetwater, contained in paragraph 5 of Bernard's affidavit, asserting it is inconsistent with Bernard's deposition testimony. (ECF 33 at 2-3). In her affidavit, Bernard states: "Cindy Goheen (HR) called me and told me that Sweetwater wasn't sure whether they could provide accommodations any longer, because 'they don't provide accommodations for people and wasn't sure what to do with [me].'" (ECF 22-1 ¶ 5 (alteration in original)).

    Bernard testified about the phone call as follows during her deposition:

    Q: How many verbal communications did you have with Cindy Goheen?

    A: One.

    Q: Was that in person or telephonic?

    A: Telephonic.

    Q: What was your verbal discussion telephonically with Cindy Goheen?

    A: She called me on November . . . 26th or 27th, the Friday after Thanksgiving, and she told me do not come into work the following day. I asked why, and she told me because they didn't know what to do with me. And I said, "But I've worked already for two days. What are you talking about?" And she goes, "Well we don't know what to do with you now." And I said, "Okay. Well, when will you know?" She goes, "HR will get back to you." And that was the extent of the conversation.

(ECF 33-1 at 7). Sweetwater contends that Bernard's description of the phone call in her affidavit is inconsistent with her deposition testimony because "[the] phone call changed to add that Goheen stated Sweetwater could not provide accommodations any longer and that Sweetwater does not accommodate opinions." (ECF 33 at 3).

    Contrary to Sweetwater's assertion, Bernard's description of the phone call "does not

contradict [her] prior deposition testimony, but instead modestly clarifies the conversation[] she

testified about at her deposition." *Quinlan v. Elysian Hotel Co. LLC*, 916 F. Supp. 2d 843, 849

(N.D. Ill. Jan. 4, 2013) (concluding that the plaintiff's affidavit did "not impermissibly add to her

deposition testimony"). "[I]t is well-settled that the party opposing summary judgment 'may

attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits.'"

*Id.* (quoting *Simmons v. Chi. Bd. of Ed.*, 289 F.3d 488, 492 (7th Cir. 2002)). Therefore,

Sweetwater's motion to strike this portion of paragraph 5 will be DENIED.

3. Paragraph 8. Sweetwater seeks to strike paragraph 8 of Bernard's affidavit in its

entirety contending that it contradicts a video recording she made or her earlier testimony. (ECF

33 at 4). Paragraph 8 reads as follows:

> Almost immediately after that email, I had a telephone conversation with Bryan
> of HR and he pointed out that other employees had received accommodations
> regarding heavy lifting. I witnessed these accommodations being made. For
> example, Luz Bruno was a Hispanic woman, approximately 8 ½ months pregnant,
> and following Sweetwater's normal practice (. . . Luz Bruno worked on the
> conveyor line just like I did) other persons moved the heavy totes for Luz Bruno
> and accommodated her that way, so there was no question, but that the
> accommodations could have been made for me. Likewise, there was one woman,
> Jessica Hostetler who hurt her back (and she also worked on the conveyor line)
> and Sweetwater accommodated her by moving her to "picking" which was a
> lighter job. So, Sweetwater could have continued to accommodate me just like it
> did when I was a non-pregnant woman – by allowing me to continue to work on
> the conveyor line but permitting other persons to lift the heavy totes, which I had
> trouble lifting anyway, pregnant or not pregnant.

(ECF 22-1 ¶ 8).

*a. Telephone Conversation with Heintz*

Sweetwater argues that Bernard's statement in her affidavit that "Bryan of HR" told her

in a telephone conversation that "other employees had received accommodations regarding

heavy lifting" is inconsistent with the recording she submitted of that telephone call. (*Id.*; ECF

33 at 4).[4] Sweetwater claims that in the recording, after Bernard named an employee that she believed received a lifting accommodation, Heintz can be heard responding that he was unaware of any accommodations for that individual. (ECF 33 at 4).

Having listened to the recording (ECF 27, 34), the Court agrees that Bernard's summation of her conversation with Heintz in the affidavit directly conflicts with the recording. In the recording, Bernard asserts that another employee, "Luz," had received accommodations for heavy lifting while pregnant, and Heintz clearly responds that he was unaware of that, had no documentation of such accommodation for this employee, and that he would look into it.[5] Thus, contrary to Bernard's representation in her affidavit, Heintz never states in the recording that other employees had received accommodations regarding heavy lifting. Consequently, the motion to strike will be GRANTED as to the last portion of the first sentence of paragraph 8 stating "and he pointed out that other employees had received accommodations regarding heavy lifting."

### b. Luz Bruno

Sweetwater also argues that Bernard's statements in her affidavit pertaining to Bruno should be stricken as conflicting with her prior deposition testimony. (ECF 33 at 4). In that regard, Sweetwater claims that Bernard testified at her deposition "that she had no idea what restrictions, if any, Luz Bruno had received from her doctors and had no knowledge of any accommodations provided by Sweetwater." (*Id.* (citing ECF 33-1 at 17-18)).

Not necessarily so. Bernard testified as follows:

---

[4] "Bryan of HR" is identified as Bryan Heintz in Sweetwater's memorandum in support of its motion for summary judgment. (ECF 14 at 8). Therefore, the Court will refer to him as "Heintz" herein.

[5] Luz's full name is Luz Bruno. (ECF 15-1 ¶ 29; ECF 22-1 ¶ 8).

Q. As you sit here today, do you have any personal knowledge as to what restrictions . . . Ms. Luz[] did or did not have?

A. Yes.

Q. What is your personal knowledge as to what restrictions she did or did not have?

A. She told me she couldn't lift up heavy weight.

Q. Other than what Ms. Luz told you about what she could or could not do with lifting heavy weight, are you aware of any formal restrictions that Ms. Luz did or did not have from a physician?

A. No.

. . .

Q. And just so the record's clear, you're not aware of any conversations Sweetwater had about what accommodations or restrictions Ms. Luz had or should be done with Ms. Luz, fair?

A. Yes.

(ECF 33-1 at 17-18).

This deposition testimony is not inherently inconsistent with Bernard's statements about Bruno in her affidavit. Bernard was asked at her deposition whether she was aware of "*any conversations* Sweetwater had about what accommodations or restrictions Ms. Luz had" (*id.* at 18 (emphasis added)), not whether, as Sweetwater paraphrases in its brief, Bernard had any *knowledge* of accommodations provided to Bruno. Bernard clearly communicated at her deposition that she witnessed accommodations provided to Bruno, which is not inconsistent with her statements in the affidavit. Therefore, the motion to strike this portion of paragraph 8 pertaining to Bruno will be DENIED.

8

*c. Jessica Hostetler*

Next Sweetwater asserts that Bernard's statements in her affidavit pertaining to Jessica Hostetler should be stricken as inconsistent with her prior deposition testimony and also as hearsay. (ECF 33 at 5). More particularly, Sweetwater contends that Bernard's deposition testimony reflects that she has no personal knowledge of what restrictions Hostetler did or did not have, or what accommodations Sweetwater did or did not provide to Hostetler. (*Id.* (citing ECF 33-1 at 17)). Sweetwater's assertion is only valid in part.

The relevant portion of Bernard's testimony is as follows:

Q. Prior to starting October 5, 2020, Jessica Hostetler would've been working at Sweetwater prior to you, is that fair?

A. Yes.

Q. And this occasion where you note that Ms. Hostetler hurt her back, was that during the fourteen (14) to fifteen (15) days you worked that you had personal observation or is that before your time?

A. Both.

Q. When did that occur, to your knowledge, for Ms. Hostetler?

A. When she first got hired on, she told me they accommodated her, and the last couple of weeks, she ended up being moved to picking because she was having some back pain.

(ECF 33-1 at 17). Therefore, while Bernard admitted at her deposition that she had no personal knowledge of what restrictions Hostetler did or did not have, Bernard testified, based on her "personal observation" in "the last couple of weeks, [Hostetler] ended up being moved to picking because she was having some back pain." (*Id.*).

Thus, contrary to Sweetwater's assertion, Bernard's statement in her affidavit that Hostetler had "hurt her back . . . and Sweetwater accommodated her by moving her to 'picking'

which was a lighter job" (ECF 22-1 ¶ 8) is not based solely on Hostetler's statements to Bernard, but rather on Bernard's personal observations. *See Mitchel v. Buncich*, No. 2:11-CV-91-PRC, 2013 WL 275592, at *10 (N.D. Ind. Jan. 24, 2013) (denying motion to strike a portion of the affidavit that was "within [the witness's] personal knowledge based on first-hand observation"). As such, Sweetwater's third argument challenging paragraph 8 of the affidavit is unpersuasive, and the motion to strike paragraph 8 in its entirety will be DENIED.

    4. <u>Portions of Paragraph 11</u>

    Sweetwater next seeks to strike the portion of paragraph 11 in Bernard's affidavit in which she attests that "[t]here were multiple positions in the warehouse that [she] could have been moved to, including 'picking[,]'" to accommodate her lifting restriction. (ECF 22-1 ¶ 11; ECF 33 at 5-6). Sweetwater contends this statement directly contradicts Bernard's deposition testimony "that she had no knowledge of jobs considered by Sweetwater she could have been moved into." (ECF 33 at 6 (citing ECF 33-1 at 19)).

    The relevant portion of Bernard's deposition testimony states:

Q. Did you discuss any other positions with anyone at Sweetwater after you provided them the twenty-five (25) pound weight restriction from Dr. Ashley Scott?

A. No.

Q. As you sit here today, do you have any knowledge of any other positions that were a potential that could've been provided to you that were considered by Sweetwater?

A. That were considered by Sweetwater? I was not privy to those conversations, so I don't know, but I had a thought of where I could go.

(ECF 33-1 at 19). Again this deposition testimony does not directly contradict Bernard's affidavit as Sweetwater suggests. In her affidavit Bernard expresses her personal belief that there

were other positions Sweetwater could have moved her into to accommodate her lifting restriction, while her deposition testimony conveys that she did not know if Sweetwater ever actually considered whether there were other positions that could accommodate her lifting restriction. These are two distinct questions. Consequently, the motion to strike will be DENIED as to paragraph 11.

    5. Portions of Paragraph 12

    Finally, Sweetwater seeks to strike the portion of paragraph 12 in Bernard's affidavit responsive to Sweetwater's proffered reasons that it could not accommodate her lifting restriction, asserting that it is "conclusory and speculative." (ECF 33 at 6). The relevant portion of this paragraph reads as follows:

> And in the midst of providing the 25 pound restriction and discussing reasonable accommodations, Sweetwater *never* told me any objections because of "technology", or that there was no way to identify "heavy totes" vs. "small totes", or that accommodations could not be provided because of identification issues involving the "weight" of totes – *These are all reasons that were dreamed up after the fact and which were never articulated to me, either over the telephone or in emails. These are made up reasons.*

(ECF 22-1 ¶ 12 (second emphasis added)).

    The Court agrees that Bernard's characterization of Sweetwater's proffered rationale as "dreamed up after the fact" and "made up reasons" is conclusory and speculative. Therefore, these portions will be stricken. *See Pfeil*, 757 F.2d at 862 (striking conclusory statements in affidavits that were "nothing more than unsupported suspicion and argumentation without foundation in the record"). Bernard's statement that Sweetwater never told her of its reasons why she could not keep working, however, will stand. Accordingly, Sweetwater's motion to strike this portion of paragraph 12 as conclusory and speculative will be GRANTED, so that the last

sentence of paragraph 12 shall read in its entirety: "These are all reasons which were never articulated to me, either over the telephone or in emails."

For the foregoing reasons, Sweetwater's motion to strike will be GRANTED IN PART and DENIED IN PART. The Court will now turn to Sweetwater's motion for summary judgment.

## II. MOTION FOR SUMMARY JUDGMENT[6]

### A. Statement of Material Facts

1. Sweetwater Hires Bernard as a Conveyable Packer on October 5, 2020

Sweetwater hired Bernard on October 5, 2020, to work as a Conveyable Packer in its Distribution Center. (ECF 42 ¶¶ 1, 3 (citing ECF 15-1 ¶¶ 4, 5)); *see also* ECF 15-3 at 20). She worked only weekends and picked up occasional extra shifts during the week if her husband was off work. (ECF 42 ¶ 2 (citing ECF 15-3 at 19)).[7]

2. The Job Duties of a Conveyable Packer

Sweetwater explains that Conveyable Packers are each assigned to a station along a conveyor line. (*Id*. ¶ 5 (citing EC F 15-1 ¶ 7)). "Totes" of items making up a customer's order come down the conveyor line and are randomly distributed to a Conveyable Packer's station. (*Id.* ¶ 6 (citing ECF 15-1 ¶ 8; ECF 15-3 at 25)). The Conveyable Packer must then lift and move the tote, pack the items to be shipped, and place the packed items back on the conveyor. (*Id*. ¶ 7 (citing ECF 15-1 ¶ 9; ECF 15-3 at 26)). Sweetwater states that like all Shipping Specialists in

---

[6] For summary judgment purposes, the facts are recited in the light most favorable to Bernard, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[7] In total, Bernard worked approximately 14 or 15 of her regularly scheduled weekend shifts. (*Id.* (citing ECF 15-3 at 19-20)).

Sweetwater's Distribution Center, Conveyable Packers have a job requirement of being able to lift up to 75 pounds. (*Id.* ¶ 4 (citing ECF 15-1 ¶ 6; ECF 15-2)).[8] Sweetwater claims that while very few totes presented to a Conveyable Packer would weigh 75 pounds, 5 to 8 percent of the totes weigh more than 25 pounds, which translates to about 15 totes weighing more than 25 pounds per shift. (ECF 42 ¶¶ 9-11 (citing ECF 15-1 ¶¶ 10-12)). The conveyor system in the Distribution Center does not have the capability to determine how much a tote weighs. (*Id.* ¶ 14 (citing ECF 15-1 ¶ 15)). Thus, the conveyor system could not assign only totes below a certain weight to an individual Conveyable Packer. (*Id.* ¶ 16 (citing ECF 15-1 ¶ 17)).

Bernard claims that in her position of Conveyable Packer she worked as a "picker, packer, and facilitator," and that in actuality, nearly 95 percent of her job involved handling items that weighed less than 25 pounds. (*Id.* ¶¶ 3-4 (citing ECF 22-1 ¶ 4; ECF 22-2 at 67-68)). She testified that while the totes could range from a few ounces up to 35 pounds, on average they were "pretty light," weighing just 5 to 10 pounds. (*Id.* ¶¶ 9, 12, 15 (citing ECF 22-2 at 14-15)). She further claims that the Conveyable Packer job had a "light section" and a "heavy section," and that because she worked in the "light section," she "very rarely" faced having to lift more than 25 pounds. (*Id.* ¶¶ 9, 11, 15 (citing ECF 22-1 ¶ 4; ECF 22-2 at 15-16)). She explained that "runners" would move heavier items or totes around from person-to-person and that it was "common practice" for other employees to handle or help lift the heavier totes, which normally were distributed to the heavy line. (*Id.* ¶¶ 4-7, 10 (citing ECF 22-1 ¶ 4; ECF 22-2 at 15-16)). Bernard concedes that the conveyor system did not have the capability to weigh each tote. (*Id.* ¶¶

---

[8] However, in its position statement to the EEOC responding to Bernard's discrimination charge, Sweetwater represented that "Bernard's position as a Packer requires *being able to lift 50 lbs.* as an essential function." (ECF 22-4 at 26 (emphasis added); *see also id.* at 28 ("Various packages weighing up to 50 lbs. travel through a conveyor.").

14-15).

   3. Bernard Informs Her Supervisor on November 22, 2020, That She Is Pregnant and
   That Her Doctor Told Her Not to Lift More Than 25 Pounds

On Sunday, November 22, 2020, Bernard informed her direct supervisor, Jeff Zombie,

that she was pregnant. (*Id.* ¶ 17 (citing ECF 15-3 at 2, 7, 13)). During this conversation, she told

Zombie that doctors usually do not want pregnant persons lifting more than 25 pounds, and that

her doctor told her not to lift more than 25 pounds; she asked Zombie if that would be okay. (*Id.*

¶¶ 18-19 (citing ECF 15-3 at 6-7; ECF 22-2 at 13)). Zombie responded that it would be okay and

that Bernard was a "good worker"; Zombie asked Bernard to get a note from her doctor to put in

her file. (*Id.* (citing ECF 15-3 at 6-7; ECF 22-2 at 13)).

   4. Bernard Brings In a Doctor's Note on November 26, 2020, Imposing a 25-Pound
   Lifting Restriction

The next day, November 23, 2020, Bernard went to her doctor and got a note imposing a

25-pound lifting restriction. (*Id.* ¶ 20 (citing ECF 15-3 at 8, 14; ECF 22-2 at 55)). On Thursday,

November 26, 2020, Bernard gave the doctor's note to a supervisor in the Distribution Center

named Erik, who said that he would put it on Zombie's desk. (*Id.* ¶ 21 (citing ECF 15-3 at 6, 9;

ECF 22-1 ¶ 3; ECF 22-2 at 24); *see also* ECF 22-2 at 26). After delivering the note, Bernard

worked that entire day without complications. (ECF 42 ¶¶ 21, 22 (citing ECF 15-3 at 16; ECF

22-1 ¶ 3; ECF 22-2 at 26-27)). The note at some point was delivered to the HR department. (*Id.* ¶

26 (citing ECF 15-1 ¶ 18)). Sweetwater represents that HR is responsible for determining how to

handle any employee medical restrictions. (*Id.* (citing ECF 15-1 ¶ 19)).

   5. Sweetwater Investigates Whether It Could Accommodate Bernard's Lifting Restriction

Sweetwater states that upon receiving Bernard's doctor's note, HR investigated whether

14

it could allow Bernard to keep working as a Conveyable Packer. (*Id.* ¶ 27 (citing ECF 15-1 ¶ 20)). It concluded that given "the technology and system in the Distribution Center," there was no reasonable accommodation that would allow Bernard to continue working on the conveyor line, and it could not allow Bernard to continue working in a position that would violate her doctor's order. (*Id.* ¶¶ 28, 29 (citing ECF 15-1 ¶ 21)).[9] Sweetwater further claims that it considered whether there were any available positions for which Bernard was qualified that would not require she lift more than 25 pounds, but no such position was available. (ECF 42 ¶¶ 30, 31 (citing ECF 15-1 ¶¶ 22, 23)). Sweetwater claims that it concluded the only way to accommodate Bernard's 25-pound lifting restriction was to place her on unpaid leave until the restriction was lifted. (*Id.* ¶ 32 (citing ECF 15-1 ¶ 24)).

Bernard disputes whether Sweetwater engaged in a meaningful investigation and whether "the technology and system in the Distribution Center" had anything to do with Sweetwater's decision. (*Id.* ¶¶ 27, 28 (citing ECF 22-1 ¶¶ 4, 12)). She claims, rather, that her pregnancy and 25-pound lifting restriction did not, in actuality, require any change in procedure or special accommodations because the actual custom and practice in the Distribution Center was that other employees normally handled the heavier items and totes for her. (*Id.* ¶¶ 28-29 (citing ECF 22-1 ¶ 4)). Bernard further claims that Sweetwater made reasonable accommodations for other employees who had difficulty lifting heavy totes, and that the technology and system in the Distribution Center did not preclude Sweetwater from affording reasonable accommodations to other employees. (*Id.* ¶ 28 (citing ECF 22-1 ¶ 8)).

---

[9] Yet, on November 26, 2020, Goheen wrote in an email to Heintz: "I didn't think we had light duty *even though there's nothing over 25 lbs. in Conveyable Pack* but didn't want to make that call." (ECF 22-5 at 79, 103 (emphasis added)).

6. Sweetwater Tells Bernard Not to Come to Work as of November 27, 2020

On either November 26 or 27, 2020, Bernard received a telephone call from Cindy Goheen, an HR employee. (*Id.* ¶ 25 (citing ECF 15-3 at 12)). Goheen advised her not to come to work starting November 27, 2020, because Sweetwater needed to determine "what to do with [her] now" in light of the 25-pound lifting restriction. (ECF 22-2 at 29; *see also* ECF 22-1 ¶ 5; ECF 42 ¶ 25 (citing ECF 15-3 at 12, 16)). Bernard reminded Goheen that she had worked the entire shift the day before, but Goheen told her not to come to work for her usual shift due to her pregnancy and lifting restriction. (ECF 42 ¶ 25 (citations omitted); *see* ECF 22-1 ¶ 5). Goheen advised Bernard that HR would get back with her. (ECF 22-2 at 29).

On November 30, 2020, Heintz of HR emailed Bernard and asked if her restrictions were going to be in place through the end of her pregnancy or if they were "more temporary." (ECF 22-4 at 17; ECF 43 ¶ 50 (citing ECF 22-1 ¶ 6)). On December 1, 2020, Bernard sent Heintz the following email:

> I would like to know why I am being treated different due to my pregnancy. I am willing and wanting to work, but I have been prevented from working since Friday the 27th. Which doesn't make sense because I told Jeff on Sunday the 22nd I am pregnant and would need weight restrictions, and I worked that day just fine. And then I handed Eric my [doctor's] letter on Thursday morning and worked all day then too. I wasn't able to do 2 totes in total, that's it. Then suddenly on Friday I have Cindy calling me telling me "she wasn't sure what to do with me because of my pregnancy. And not to come back until HR contacts me." Why was I able to work those two days then? This is starting to clearly tell me I am being treated differently due to my pregnancy and asking for a singular accommodation. I saw Luz go thru a pregnancy and not receive the heavy totes with no difficulties[.] I also know Jessica Hostetler hurt her back and you accommodated her with no difficulties also. I would like to know the status of my job because I am making no money because I am being told to not come back until HR deals with me. What does that timeline look like? I have already lost 24 hours of work that I am not being paid for. I would like an answer ASAP on my job status. Keeping me in limbo is unreasonable, especially right before Christmas.

(ECF 22-4 at 37; *see also* ECF 22-1 ¶ 7).

Almost simultaneously therewith, Heintz called Bernard and told her that she could not work with a 25-pound lifting restriction. (ECF 15-1 ¶ 25; ECF 22-1 ¶ 8; ECF 27, 34). Heintz explained that all of the positions in the "facility" require the ability to lift 75 pounds, that Bernard's condition was not work-related, and that Sweetwater does not normally accommodate non-work related conditions. (ECF 27, 34). He said that Bernard would need to be off work until she was released from the restriction, which in this case would be through the end of her pregnancy, and that absent a full release from her doctor, she could not work "until [she] get[s] back." (*Id.*). Heintz further explained that Sweetwater had looked into whether it had done anything to accommodate other employees in a similar situation, and it had not. (*Id.*).

Bernard, however, disputed this point with Heintz, asserting that Sweetwater accommodated other employees' lifting restrictions, such as Bruno, a temporary employee who worked when she was 9-months pregnant and also could not lift heavy totes. (*Id.*). Heintz responded that he would need to look into that because he did not have any knowledge or documentation of such accommodations for Bruno. (*Id.*). In closing the conversation, Bernard stated: "For the most part, as of right now, I am without a job, is that correct?" (*Id.*; *see also* ECF 15-1 ¶ 26; ECF 22-1 ¶ 9). Heintz responded, "That is correct. We wouldn't be able to have you work . . . with those restrictions." Bernard then ended the call. (ECF 27, 34). Bernard recorded the call. (*Id.*; *see* ECF 22-1 ¶ 10).

7. <u>Events Following Sweetwater's Telling Bernard Not to Come to Work</u>

After the birth of her child, Bernard made no attempt to return to work at Sweetwater. (ECF 42 ¶ 36 (citing ECF 15-1 ¶ 28; ECF 15-3 at 18; ECF 22-2 at 62, 65)). Nevertheless, since

December 2020, Bernard has been listed as an active employee in Sweetwater's system, and she has continued to receive emails from Sweetwater about things that were happening on her shift, such as birth announcements and shift availability. (*Id.* ¶¶ 35, 37 (citing ECF 15-1 ¶ 27; ECF 15-3 at 18; ECF 22-2 at 83-84)). Bernard believed that she just got stuck on some Sweetwater automatically-generated mailing list, and thus did not correspond with Sweetwater about why she was still receiving its emails. (*Id.* (citing ECF 22-2 at 86)).

On January 16, 2021, Kenny Gales, a Sweetwater supervisor, evaluated Bernard's performance in an annual written review. (ECF 43 ¶¶ 52-53 (citing ECF 22-1 ¶¶ 13-14; ECF 22-5 at 41-42, 84)). He wrote that her productivity was "[b]elow average"; that she had "missed several days"; and that she was a "[c]apable employee but easily lured into excessive socializing." (ECF 22-5 at 41-42, 84). He assigned her a "Below Expectations" rating. (*Id.*). In the two months Bernard actively worked at Sweetwater in 2020, she was never given a "below average" productivity rating, counseled about absenteeism, or assigned a rating of "Below Expectations." (ECF 43 ¶ 52 (citing ECF 22-1 ¶ 13)). Rather, Sweetwater asked her to train other employees. (*Id.* ¶ 53 (citing ECF 22-1 ¶ 14)).

8. <u>Bernard's Possible Comparators</u>

Bernard identifies three other Sweetwater employees who she contends received accommodations as possible similarly situated individuals: Bruno, Hostetler, and Denise Garwood. (ECF 42 ¶ 38 (citing ECF 15-3 at 3-5); ECF 43 ¶ 54 (citing ECF 22-1 ¶ 15; ECF 22-5 at 86)). Bernard also suggests that she can serve as her own comparator, given that other employees routinely helped her lift heavy totes before she was pregnant. (ECF 42 ¶ 29 (citing ECF 22-1 ¶¶ 4, 8)).

18

Bruno worked on the conveyor line in the Distribution Center as a temporary employee when she was almost 9 months pregnant. (*Id.* ¶¶ 39-42 (citing ECF 15-1 ¶¶ 29-30; ECF 22-1 ¶ 8; ECF 22-3 at 4-5)). Bruno did not provide Sweetwater with any written medical restrictions that would prevent her from doing her job. (*Id.* ¶ 43 (citing ECF 15-1 ¶ 31)). Nor did Sweetwater create a special light duty position for Bruno. (*Id.* ¶ 44 (citing ECF 15-1 ¶ 32)). While Bernard admits she has no personal knowledge whether Bruno had been assigned any formal restrictions, Bruno told her that Sweetwater was not giving her any heavy totes. (*Id.* ¶¶ 39, 46 (citing ECF 15-3 at 21-22; ECF 22-1 ¶ 8; ECF 22-2 at 69)). Further, Bernard personally saw other employees assist Bruno by moving heavy totes for her on the conveyor line when Bruno was 8½ months pregnant. (*Id.* (citing ECF 22-1 ¶ 8; ECF 22-2 at 69)). These employees assisted Bruno with heavy lifting in front of the Sweetwater supervisor. (*Id.* ¶ 45 (citing ECF 15-1 ¶ 33; ECF 22-1 ¶ 8)). In fact, every time Bernard worked as a "facilitator," the Sweetwater supervisor reminded her not to give Bruno any heavy totes. (*Id.* (citing ECF 22-2 at 7)).

Hostetler also worked on the conveyor line in the Distribution Center, having started her employment there before Bernard was hired. (ECF 22-2 at 68). Hostetler told Bernard that Hostetler had hurt her back when she was first hired at Sweetwater, that she could not lift heavy weight, and that Sweetwater accommodated her at that time. (ECF 22-1 ¶ 8; ECF 22-2 at 11; ECF 42 ¶ 46 (citing ECF 22-2 at 69)). Bernard more specifically testified that in "the last couple of weeks"—that is, "during the fourteen . . . to fifteen . . . days [Bernard] worked that [she] had personal observation [of Hostetler]"—Hostetler was moved to "picking" because she was having some back pain. (ECF 22-2 at 68-69). Hostetler did not provide Sweetwater with written medical restrictions that would prevent her from doing her job. (ECF 42 ¶ 47 (citing ECF 15-1 ¶ 34)).

Bernard admits she had no personal knowledge whether Hostetler had any formal restrictions. (*Id.* ¶ 46 (citing ECF 15-3 at 21; ECF 22-2 at 69)).

Denise Garwood had a work limitation in that she "could not pack . . . because of an injury and Sweetwater accommodated her by giving her a pass on packing." (ECF 43 ¶ 54 (citing ECF 22-1 ¶ 15)). In reviewing Garwood, Gale described her as an "[o]utstanding" and "[v]ery hard worker." (*Id.* (citing ECF 22-1 ¶ 15; ECF 22-5 at 86)).

### B. Standard of Review

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* (citations omitted). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citation omitted).

20

### C. Discussion

Sweetwater seeks summary judgment in its favor on Bernard's discrimination and retaliation claims, contending that Bernard has not established a *prima facie* case of discrimination or retaliation. Sweetwater further contends that it provided legitimate, non-discriminatory reasons for its actions, and that Bernard fails to show such reasons are pretextual. The Court will begin with Bernard's discrimination claim.

1. <u>Summary of Law Applicable to Discrimination Claims</u>

"Title VII makes it unlawful in relevant part for an employer 'to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *E.E.O.C. v. Wal-Mart Stores East, L.P.*, 46 F.4th 587, 593 (7th Cir. 2022) (quoting 42 U.S.C. § 2000e-2(a)(1)). In 1978, Congress extended Title VII protection to pregnant women through the PDA by amending it in two ways: (1) declaring that "sex discrimination includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions'"; and (2) providing that "'women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.'" *Id.* (emphasis omitted) (quoting 42 U.S.C. § 2000e(k)).

The present case involves a "'disparate-treatment' claim—a claim that an employer intentionally treated a complainant less favorably than employees with the 'complainant's qualifications' but outside the complainant's protected class." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "[L]iability in a disparate-treatment case depends on whether the protected trait actually

21

motivated the employer's decision." *Id.* (citation omitted). "[A] plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*." *Id.* at 213 (citation omitted).

Under the direct method, "the plaintiff may avoid summary judgment by producing sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge." *Jerles v. Stallard & Assocs., Inc.*, No. 1:19-cv-00856-TWP-DML, 2020 WL 4604447, at *7 (S.D. Ind. Aug. 10, 2020) (quoting *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998)). "In pregnancy discrimination cases, direct evidence of discriminatory intent 'generally is in the form of an admission by a supervisor or decision maker that the employee was suspended because she was pregnant.'" *Id.* (quoting *Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 723 (7th Cir. 1998)).

Under the indirect method, the plaintiff must "'carry the initial burden' of 'establishing a prima face case'" of discrimination. *Young*, 575 U.S. at 213 (quoting *McDonnell Douglas*, 411 U.S. at 802). "[A]n individual plaintiff may establish a prima facie case by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." *Id.* at 228 (citation and internal quotation marks omitted). If the plaintiff invokes the *McDonnell Douglas* framework in an effort to establish a *prima facie* case of disparate treatment under the PDA based on denial of accommodation, she must show "that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" *Id*. at

22

229; *see also Wal-Mart Stores East, L.P.*, 46 F.4th at 594 (applying the "familiar three-step *McDonnell Douglas* burden-shifting framework, as adapted to pregnancy discrimination in *Young*" (citing *Young*, 575 U.S. at 229)); *Jerles*, 2020 WL 4604447, at *6.

If the plaintiff carries her burden of establishing a *prima facie* case, "[t]he employer may then seek to justify its refusal to accommodate the plaintiff by relying on 'legitimate, nondiscriminatory' reasons for denying her accommodation." *Young*, 575 U.S. at 229 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Wal-Mart Stores East, L.P.*, 46 F.4th at 594-95; *Jerles*, 2020 WL 4604447, at *6. "If the employer offers an apparently 'legitimate, non-discriminatory' reason for its actions, the plaintiff may in turn show that the employer's proffered reasons are in fact pretextual." *Young*, 575 U.S. at 229; *see also Wal-Mart Stores East, L.P.*, 46 F.4th at 595.

One point of clarification about the direct and indirect methods of proof: The Seventh Circuit Court of Appeals has rejected "the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Rather, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* Accordingly, the Seventh Circuit has clarified that "the singular question that matters in a discrimination case [is] '[w]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 765). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ." *Id.* (quoting *Ortiz*, 834 F.3d at 765).

2. <u>Analysis of Discrimination Claim</u>

In its motion for summary judgment, Sweetwater argues that Bernard fails to establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework. While there is no dispute that Bernard belongs to a protected class and sought an accommodation, Sweetwater argues that: (1) Bernard did not suffer an adverse employment action because she was placed on unpaid administrative leave as a reasonable accommodation rather than terminated, and (2) no similarly situated employee outside of her protected class received more favorable treatment. (ECF 14 at 5-11). Sweetwater further contends that no reasonable jury could conclude that the proffered reasons for its actions pertaining to Bernard were pretextual. (*Id.* at 12).

Bernard disagrees. She argues that she was terminated, not placed on administrative leave, and thus suffered an adverse employment action. (ECF 26 at 6-8). Reading the record generously, Bernard identifies Bruno, Hostetler, Garwood, and herself (before she was pregnant) as potential similarly situated individuals. (*Id.* at 3-4; ECF 22-1 ¶ 15; ECF 42 ¶ 54). Bernard further argues that looking at the evidence "in a single pile" and evaluating it "as a whole" (ECF 26 at 3), Sweetwater's "ever-changing and fishy" reasons for terminating her, coupled with the timing of her termination on the heels of her pregnancy announcement, are sufficient for a rational jury to conclude that Sweetwater discriminated against her based on her pregnancy when it terminated her (*id.* at 5-6). The Court will address each of these arguments in turn.

*a. Adverse Employment Action*

Sweetwater contends that Bernard did not suffer an adverse employment action because she was never denied a reasonable accommodation and her employment was never terminated. (ECF 14 at 5). Sweetwater claims Bernard was placed on unpaid leave as a reasonable

24

accommodation for her 25-pound lifting restriction. (*Id.*). In support, Sweetwater emphasizes that Bernard remained active in Sweetwater's system since November 2020 and has continued to receive emails from Sweetwater. (*Id.* at 8). Sweetwater also relies on the telephone conversation between Bernard and Heintz on December 1, 2020, in which Heintz responded affirmatively when Bernard asked whether she was without a job "*as of right now.*" (*Id.* (emphasis added)). Sweetwater contends that Heintz's response to Bernard's question is clearly "a description of temporary leave," not termination. (*Id*).[10]

Contrary to Sweetwater's assertion, it is possible a reasonable jury could also interpret Heintz's response on December 1, 2020, as a termination, rather than temporary leave. Bernard apparently did. While placing an employee on unpaid leave can be a reasonable accommodation under certain circumstances, *see, e.g.*, *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95 C 3834, 1997 WL 106257, at *6-7 (N.D. Ill. Feb. 10, 1997) (finding that a temporary leave of absence was a reasonable accommodation for an employee placed on bed rest due to a high-risk pregnancy), given that the record here is devoid of any further communication, whether oral or written, from Sweetwater communicating to Bernard that she was being placed on temporary leave as an accommodation for her lifting restriction (ECF 42 ¶ 32 (citing ECF 22-1 ¶¶ 9, 11)), the Court cannot conclude for purposes of summary judgment that Sweetwater's proffered interpretation is the only reasonable one.

In any event, the Seventh Circuit "ha[s] defined adverse employment quite broadly." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (citation omitted).

---

[10] Although the parties do not mention this in their briefs, Heintz did say at one point in the conversation that absent full release from her doctor Bernard could not work "until [she] get[s] back." (ECF 27, 34).

Materially adverse employment actions are generally categorized into three groups of cases involving:

> (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to humiliating, degrading, unsafe, unhealthful, or otherwise significant negative alteration in her work place environment.

*Id.* (citation, brackets, and internal quotation marks omitted).

In *Arizanovska v. Wal-Mart Stores, Inc.*, also a pregnancy discrimination case, Wal-Mart argued that its offer of unpaid leave of absence to Arizanovska was not materially adverse because it was consistent with its Accommodation Employment Policy. *Id*. As Wal-Mart saw it, "the choice was either terminate Arizanovska or place her on an unpaid leave of absence because there were no other open positions . . . , and, according to its Accommodation Employment Policy, Wal-Mart does not create light duty positions for *any* employee." *Id.* The court was not persuaded by Wal-Mart's proffered rationale, stating: "That may be well and true; however, that rationale ignores the reality of the situation. The fact remains, Arizanovska went from a part-time employee to unpaid and temporarily unemployed." *Id.* As such, the court found that Arizanovska had suffered an adverse employment action, opining: "Being forced to take an unpaid leave of absence certainly falls into the first category of material adverse employment actions." *Id.*; *see also Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (denying the pregnant plaintiff accommodating work within her restrictions and instead placing her on an extended leave of absence, partly without pay, subjected her to an adverse employment action).

*Arizanovska* is sufficiently analogous to the facts presented here. Even if a reasonable

jury credited Sweetwater's position that it did not terminate Bernard's employment and instead placed her on unpaid leave, it ultimately makes no difference at the summary judgment stage. Bernard suffered an adverse employment action—whether through being unwillingly placed on unpaid leave or by termination of her employment. Therefore, she satisfies the third prong of her *prima facie* case of discrimination for purposes of summary judgment.

### b. Similarly Situated Individuals

Sweetwater next argues that Bernard fails to establish the fourth prong of her *prima facie* case of discrimination—that Sweetwater accommodated other employees outside of Bernard's protected class "similar in their ability or inability to work." *Young*, 575 U.S. at 229. To review, "[t]he PDA does not require preferential treatment for a pregnant employee—just the same treatment as a nonpregnant employee would receive. Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees without violating the PDA." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1010 (7th Cir. 1997) (citation omitted).

Reading the record in the light most favorable to Bernard and affording her every reasonable inference, Bernard identifies Bruno, Hostetler, and Garwood as potential comparators, as well as herself prior to her pregnancy. (ECF 22-1 ¶¶ 4, 8, 11, 15). As explained earlier, Bruno worked on the conveyor line in the Distribution Center when she was almost 9 months pregnant. (ECF 22-1 ¶ 8). Bruno did not submit written medical restrictions to Sweetwater (ECF 15-1 ¶ 31), but Sweetwater supervisors instructed other employees to lift heavy totes for her (ECF 22-2 at 7). The Court, however, cannot infer pregnancy discrimination based on Bruno because she was not outside of Bernard's protected class. *See Arizanovska*, 682

F.3d at 703 ("Both of the employees [Arizanovska] identified were pregnant, and so we cannot infer pregnancy discrimination on that basis because there is no comparison between the treatment of pregnant employees versus non-pregnant employees."). Thus, Bruno is not a similarly situated individual for purposes of the prong-four analysis.

Hostetler was an employee who worked on the conveyor line with Bernard but was moved to "picking" due to having back pain. (ECF 22-2 at 68-69).[11] Hostetler is outside of Bernard's protected class, as there is no evidence that she was pregnant at the time. (*Id.*). Sweetwater, however, claims that Hostetler is not similarly situated because, unlike Bernard, she did not provide Sweetwater with written medical restrictions that would prevent her from performing her job duties. (ECF 15-1 ¶ 34). But Sweetwater's attempt to discard Hostetler as a potential comparator on this basis alone turns a blind eye to Sweetwater's actual custom and practice in the Distribution Center. An employee's physical limitations were at times accommodated by Sweetwater supervisors in the Distribution Center whether or not the employee had written restrictions. For example, Bernard testified that every time she worked as a facilitator, a Sweetwater supervisor reminded her not to give Bruno any heavy totes. (ECF 22-2 at 7). This testimony materially disputes Sweetwater's evidence that any assistance with heavy lifting provided by employees to Bruno was "not something directed by Sweetwater." (ECF 15-1 ¶ 33).

Similarly, Sweetwater apparently moved Hostetler to "picking" due to her back pain even though she had no written restrictions. And before Bernard was pregnant, Sweetwater informally

---

[11] The record does not clearly reflect whether Hostetler injured her back on or off the job. The Court will afford Bernard every reasonable inference in her favor for summary judgment purposes and infer that Hostetler had a non-work-related back injury.

accommodated Bernard's inability to lift heavy totes by allowing other employees to lift them for her. (ECF 22-1 ¶¶ 4, 8, 9). This begs the following question: Why then did a Sweetwater supervisor treat Bernard differently and require her to obtain written restrictions from her doctor, rather than just informally accommodate her oral request for lifting no more than 25 pounds during her pregnancy like it apparently did with Hostetler and Bernard before she was pregnant? "[E]mployers are not required to give pregnant women special treatment; they must only treat them the same as all other employees." *Atteberry v. Dep't of State Police*, 224 F. Supp. 2d 1208, 1212 (C.D. Ill. 2002) (citations omitted). When viewing the evidence in the light most favorable to Bernard and affording her every reasonable inference, the Court concludes that, given Sweetwater's actual custom and practice in the Distribution Center of accommodating some employees' limitations regardless of written restrictions, Bernard identifies at least two potential comparators—Hostetler and Bernard before her pregnancy.[12] Therefore, Bernard sufficiently establishes a *prima facie* case of pregnancy discrimination for purposes of summary judgment.

      *c. Sweetwater Offers Legitimate, Non-Discriminatory Reasons for Its Employment Action*

An employer may overcome a plaintiff's *prima facie* case of discrimination by providing a legitimate, non-discriminatory reason for the employment action taken against the plaintiff. *Young*, 575 U.S. at 229. Here, Sweetwater states that a Conveyable Packer in its Distribution Center has a job requirement of being able to lift up to 75 pounds, and while few totes actually

_____

[12] Sweetwater also apparently credited Garwood's request that she not "pack due to an old injury." (ECF 22-5 at 86; *see also* ECF 22-1 ¶ 15). The record, however, does not reveal what type of limitations or injury Garwood purportedly had, whether she provided Sweetwater with written restrictions, or any other details about her. Given the lack of evidence and argument from Bernard about Garwood, Bernard has failed to carry her burden at this stage to show that Garwood is a similarly situated individual. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment in the lawsuit." (citation omitted)).

weigh 75 pounds, a significant number of totes do weigh more than 25 pounds. (ECF 15-1 ¶¶ 6, 10-14). Sweetwater further attests that given the technology and system in its Distribution Center, there was no way to ensure that Bernard would not have to lift 25 pounds as a Conveyable Packer. (*Id.* ¶¶ 15-17, 21). Finally, Sweetwater states that there were no other available positions for which Bernard was qualified that would not require lifting more than 25 pounds. (*Id.* ¶¶ 22-23). As such, Sweetwater claims that the only way it could accommodate Bernard's lifting restriction was to place her on unpaid leave until she was released from the restriction. (*Id.* ¶ 24). Given these proffered reasons, Sweetwater has satisfied its burden of production to articulate a legitimate, non-discriminatory reason for its action.

### d. Pretext for Discrimination

Once the employer articulates a legitimate, non-discriminatory reason for its employment action, the employee then has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant . . . were not its true reasons, but were a pretext for discrimination." *Young*, 575 U.S. at 213 (citation omitted). Bernard claims that pretext can be inferred here because Sweetwater's "story changed and its reasons for terminating [her] became ever-changing and fishy." (ECF 26 at 5); *see Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The Civil Rights Act of 1964 does not require employers to have 'just cause' for sacking a worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is pretext for discrimination." (citations omitted)).

Bernard takes issue with all of Sweetwater's proffered reasons for the adverse employment action. First, Bernard faults Sweetwater for denying her the accommodation

outright in November/December 2020 without explaining why it did so, and telling her "merely

to stay home until HR got [a hold] of her while they considered 'what to do with her now.'"

(ECF 26 at 5). Bernard also contends Sweetwater's view that it never fired her but granted her

the accommodation of returning to work after her pregnancy "is an outright lie." (*Id.*). Further,

Bernard is suspicious of Sweetwater's assertion that the "technology did not exist" to allow

weighing of totes to determine if they were less than 25 pounds, because this reason was never

articulated to her at the time and is a convenient "after-the-fact" criticism. (*Id.*). In any event,

Bernard views the technology as irrelevant because totes weighing more than 25 pounds could

be lifted by other employees, which was the "customary practice *before* she was pregnant." (*Id.*).

Bernard also disputes Sweetwater's assertion that there were no available positions for which she

was qualified that did not require lifting more than 25 pounds, given that this information was

never shared with her in November 2020 and such positions did exist in the warehouse. (*Id.* at 5-

6; *see* ECF 22-1 ¶ 11). Finally, Bernard contends that the time period of just a few days between

her pregnancy announcement and the adverse employment action was "not merely suspicious,

but telling of discriminatory animus." (ECF 26 at 6).

     Some of Bernard's arguments are easily disposed of. That Sweetwater initially took four

or five days (from November 26 or 27, 2020, to December 1, 2020) to investigate whether it

could accommodate her with a 25-pound lifting restriction as a Conveyable Packer, or in another

available position for which she was qualified, strikes the Court as sensible rather than

suspicious. (*See* ECF 15-1 ¶ 25; ECF 22-1 ¶ 10; ECF 22-2 at 29; ECF 27, 34). Nor does the fact

that Sweetwater did not share with her at the time the steps it took to investigate whether it could

accommodate her 25-pound lifting restriction in the Conveyable Packer position, or whether

there was another open position for which she was qualified, seem particularly suspicious. Generally speaking, "[a]n employer need not inform an employee of all possible reasons it may have for terminating [or taking an adverse employment action against] an employee." *Steele v. City of Bluffton*, 31 F. Supp. 2d 1084, 1096 (N.D. Ind. Dec. 22, 1998) (citation omitted). "[A]n employer's silence regarding the reason for taking an employment action is insufficient to create an inference of pretext." *Id.* (citations omitted). That Sweetwater now elaborates on its reasoning in defending itself against Bernard's federal lawsuit should come as no real surprise to her.

Also, Bernard's proffered theory that Sweetwater intentionally kept her on its email list to make it look like she was on leave rather than terminated, and then created a fake performance review for her in January 2021 to manufacture a record of performance deficits, lacks any support in the record. (ECF 26 at 7-8). Sweetwater's internal communications of record dating from November 2020 through July 2021 do not support Bernard's theory of dishonesty; rather, Sweetwater's internal communications during this period consistently support Sweetwater's position that Bernard was out on leave due to her pregnancy-related lifting restriction. (*See* ECF 22-5 at 78-110).

And while Bernard describes herself as an outstanding employee (ECF 22-1 ¶ 14 ("I never missed several days, I was never given a bad review, and was never counseled for 'below expectations'—in fact, [Sweetwater] asked me to train other employees.")), the fact remains that she only actively worked at Sweetwater for two months, and thus, the January 2021 annual performance review was her first annual review (ECF 22-2 at 46-47). Therefore, this is not a case in which an employee had years of satisfactory performance reviews precede a critical one near in time to an adverse employment action. *Compare Lang v. Ill. Dep't of Children & Family*

32

*Servs.*, 361 F.3d 416, 420 (7th Cir. 2004) (finding the timing of the employee's discipline immediately after he filed a charge of race discrimination was extremely suspicious where the employee had five preceding years of satisfactory performance), *with Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 n.17 (7th Cir. 2006) (finding a critical performance review in the same month the employee complained about discrimination was not necessarily suspicious where the employee had worked for the defendant less than a year and was still on probation).

However, Bernard's assertion that Sweetwater has changed its story about the reasons why she could not continue in the Conveyable Packer position gains more traction in the record. Sweetwater claims it told Bernard in November 2020 that she could not work as a Conveyable Packer with a 25-pound lifting restriction (ECF 27, 34), and then advances that same reasoning here (ECF 15-1 ¶¶ 6, 10-21, 24). But there are several pieces of conflicting evidence of record which give the Court pause about one material aspect of Sweetwater's proffered explanation—the actual lifting requirements of a Conveyable Packer.

The first is a November 26, 2020, email from Goheen to Heintz, in which Goheen stated: "I didn't think [Sweetwater] had light duty *even though there's nothing over 25lbs in Conveyable Pack* but didn't want to make that call." (ECF 22-5 at 79, 103 (emphasis added)). Next is Sweetwater's undated position statement to the EEOC in response to Bernard's discrimination charge, stating: "Bernard's position as a Packer requires *being able to lift 50 lbs. as an essential function.*" (ECF 22-4 at 26 (emphasis added)); *see also id.* at 28 ("Various packages weighing up to 50 lbs. travel through a conveyor.")). Yet, Sweetwater now represents in an affidavit of one of its officers and an undated job description that a Conveyable Packer *has to lift 75 pounds* as an essential function. (ECF 15-1 ¶ 6; ECF 15-2). This is the kind of shifting

33

evidence that calls into question the honesty of Sweetwater's proffered reasons for its adverse employment action against Bernard. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext." (citation omitted)).

Furthermore, a material dispute of fact exists on this record whether Sweetwater had other available positions during the relevant period for which Bernard was qualified that did not require lifting more than 25 pounds. Sweetwater, relying on an affidavit of one of its officers, states that it considered whether there were any available positions for which Bernard was qualified that would not require lifting more than 25 pounds, but that "[n]o such position was available at that time." (ECF 15-1 ¶ 23). To the contrary, Bernard attests in her affidavit that "[t]here were multiple positions in the warehouse that I could have been moved to, including 'picking'" (ECF 22-1 ¶ 11), which "was a lighter job" (*id.* ¶ 8). This material dispute of fact precludes summary judgment and must be presented to a jury to resolve. *Waldridge*, 24 F.3d at 920; *cf. Metzler v. Kentuckiana Med. Ctr.*, No. 4:11-cv-00101-TWP-TAB, 2013 WL 1619592, at *3 (S.D. Ind. Apr. 15, 2013) ("[I]t is undisputed that when Ms. Metzler submitted her lifting restrictions, Kentuckiana did not have alternative open positions to which Ms. Metzler could be moved."). Accordingly, Sweetwater's motion for summary judgment on Bernard's discrimination claim will be DENIED.

### 3. Summary of Law Applicable to Retaliation Claims

"Title VII protects not only against forms of job discrimination, but also from retaliation for complaining about the types of discrimination it prohibits." *Duis v. Franciscan All., Inc.*, No. 2:20-CV-78-PPS, 2022 WL 3017321, at *7 (N.D. Ind. July 29, 2022); *see Miller v. Am. Family*

*Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). To establish a *prima facie* case of retaliation, a plaintiff "must show that (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse job action." *Id.* (quoting *Miller*, 203 F.3d at 1007).

"Direct evidence, such as an admission by the employer of unlawful animus, is sufficient to demonstrate a causal connection, but rare." *Kotaska v. Fed. Express Corp.*, No. 16-cv-9321, 2018 WL 3993722, at *17 (N.D. Ill. Aug. 21, 2018) (citation omitted). "Without direct evidence of causation, [a plaintiff] must rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Burton*, 851 F.3d at 697 (citatoin omitted). If the plaintiff establishes the *prima facie* elements of retaliation, the burden shifts to the defendant "to produce evidence that, when taken as true, shows it had a legitimate, non-discriminatory reason[] for its actions." *Norwood v. City of Chi.*, No. 18-cv-7270, 2021 WL 2036533, at *2 (N.D. Ill. May 21, 2021) (citations omitted). If the defendant makes this showing, the burden returns to the plaintiff to prove, by a preponderance of the evidence, that the proffered reasons are pretext for retaliation. *Id.*

In a retaliation case, "[t]he ultimate question is: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [adverse employment action]?'" *Jasnic v. Bisco, Inc.*, No. 1:20-CV-02507, 2022 WL 971606, at *8 (N.D. Ill. Mar. 31, 2022) (quoting *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021)); *see Burton*, 851 F.3d at 697 ("[T]he dispositive question remains whether a

reasonable jury could find a but-for causal link between the protected activities and adverse actions at issue.").

    4. <u>Analysis of Retaliation Claim</u>

Bernard relies on suspicious timing to establish her *prima facie* showing of retaliation. (ECF 26 at 9). In that regard, Bernard announced her pregnancy to Zombie and asked for a pregnancy-related accommodation on November 22, 2020 (ECF 22-2 at 13, 20), and nine days later, on December 1, 2020, complained of pregnancy discrimination to Heintz in an email and a telephone call (ECF 22-4 at 37; ECF 27, 34). On either November 26 or 27, 2020, Goheen instructed Bernard not to return to work as of November 27, 2020, until they could determine what to do with her (ECF 22-1 ¶ 5; ECF 22-2 at 29), and then Heintz definitively told Bernard on December 1, 2020, that she could not return to work until she was released from the 25-pound lifting restriction (ECF 15-1 ¶ 25; ECF 27, 34). The Seventh Circuit has "permitt[ed] an inference of causation on the sole basis of temporal proximity when the timing is 'no more than a few days' because 'the closer two events are, the more likely that the first caused the second.'" *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)).

Sweetwater does not directly dispute Bernard's assertion of close temporal proximity and suspicious timing as *prima facie* evidence of causation. (ECF 32 at 7). Sweetwater, rather, argues that Bernard's retaliation claim fails for the same reasons that her discrimination claim does. (ECF 14 at 12). Sweetwater then reiterates the same reasons it advanced with respect to the discrimination claim—that it placed Bernard on unpaid leave as a reasonable accommodation for her 25-pound lifting restriction, that the technology and system in the Distribution Center did not

allow Sweetwater to ensure Bernard would not have to lift more than 25 pounds, and that there were no other available positions for which Bernard was qualified that did not require lifting more than 25 pounds. (*Id.*). In response, Bernard contends that these reasons are all pretextual (ECF 26 at 9), and in reply, Sweetwater reiterates its position that Bernard's assertion of pretext has no support in the record (ECF 32 at 7-8).

Given that the Court has already concluded *supra* that Sweetwater produced some shifting evidence about the lifting requirements of a Conveyable Packer, which can be indicative of dishonesty, *Schuster*, 327 F.3d at 577, and because a material dispute of fact exists whether there were other available positions for which Bernard was qualified that would not require her to lift more than 25 pounds, *Waldridge*, 24 F.3d at 920, Bernard's retaliation claim, like her discrimination claim, cannot be resolved in summary judgment. Accordingly, the Court DENIES Sweetwater's motion for summary judgment and will set Bernard's discrimination and retaliation claims for trial.

## III. CONCLUSION

For the reasons given herein, Sweetwater's motion to strike (ECF 33) portions of Bernard's affidavit (ECF 22-1) is GRANTED IN PART and DENIED IN PART as set forth in this Opinion and Order. Sweetwater's motion for summary judgment (ECF 13) is DENIED. A scheduling conference to establish a trial date is set in this case for October 17, 2023, at 10:30am.

SO ORDERED. Entered this 29th day of September 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge